Today's cases will be called as previously announced, and the times will be as allotted to counsel. The first case today is number 221491, Jose Santiago, Incorporated, v. Smithfield Packaged Meats Corporation. Would the attorney for the appellant please come to the podium and introduce himself on the record to begin? My name is Alfredo Fernandez, and I represent Jose Santiago Appellant in this case. If I'm allowed, I would like to reserve two minutes for rebuttal. Yes, you may. Okay. In 2021, this same panel decided a case, the Casco sales case, where it reiterated the public policy behind Law 75. Puerto Rico enacted Law 75 to protect dealers, such as my client, Jose Santiago, from principles that arbitrarily and without just cause terminate or impair an existing distribution agreement after the dealer has created a market for their products in the island. That is precisely what has happened in this case. Since 1995, Jose Santiago has been the exclusive distributor of products, at that time farmland food products. Jose Santiago is a food service distributor, distributor for hospitals, hotels, restaurants, and so forth. Jose Santiago uninterruptedly distributed the farmland food products since 1995, and there was no written distribution agreement. But it's uncontested on the record that he was the exclusive distributor for farmland food products in Puerto Rico. In 2003, Appellee here in this case, Smithfield Foods, acquired farmland foods. Jose Santiago continued after that acquisition to uninterruptedly distribute the products for Smithfield Foods. Smithfield did not require Jose Santiago to execute a written distribution agreement. Smithfield did not condition Jose Santiago's continuance as a distributor in Puerto Rico for the products on establishing sales quotas or volumes of purchases or even fixed prices. How many products that used to be called farmland are still distributed under the brand name Smithfield? And the rest of the question is, is it your request for an injunction just for those continuing products? That's a very good question, Your Honor, and the answer is yes. All of the farmland- The answer to the first one can't be yes because- Yes, but the answer to the second one is yes. The answer to the first question is that all of the farmland food products that were distributed by Jose Santiago are currently Smithfield products. And if you see Plaintiff's Exhibit 11 in the preliminary injunction hearing, you're going to see a document from Smithfield that states it's the same exact products, same global identification numbers, the same qualities, the same product, only a different brand. All right, so the merger didn't result in a reduction- Not at all. Of products that used to be sold as farmland being eliminated from the market. Not at all. And in fact, after the acquisition, Jose Santiago, after 2003, Jose Santiago continued to sell farmland products for Smithfield. It was just until 2020 that Smithfield- 2021, February 2021, that Smithfield decided to consolidate the brands. And to your question, in that consolidation in 2021, all of the farmland food products that were sold by Jose Santiago continued to be sold under the Smithfield brand, and Jose Santiago continued to sell those products under the Smithfield brand to its customers. And what's concerning here, looking at Law 75 on the public- Do those, what were previously farmland branded products, make up the entire universe of the 40 products that you want to be permitted to continue to be the dealer for? Yes, those are the same- There's none, so they're the same. They're the same. And after 2000- So after 2003, did your client distribute Smithfield products that had not previously been farmland products? Yes, after 2003, and especially after- And was that exclusive? Jose Santiago was the only distributor for the Smithfield products that he was selling for the 40 products. Until when? It was the exclusive until October 2021. So there is, is there not, evidence in the record that there was another distributor distributing at least some Smithfield products long before that? No, not at all. The products- Long before 2021? Not before 2021. There's no evidence in the record to that? There's no evidence on the record for the food service market, okay, channel of distribution, which is what my client does. There are Smithfield products on retail markets, that's not in question here, and supermarkets, et cetera. This is for food service channel of distribution. I'm sorry, how does, I guess what we're trying to figure out is how does this Ballester Hermanos Inc. come into play? I mean, I got the impression from the briefs that they were distributing some line of Smithfield. Ballester Hermanos is a competing distributor of Jose Santiago. Before the brand consolidation, Ballester Hermanos sold some of the other brands that were not farmland brands, did not constitute, that those sales did not constitute the majority of the volume of sales of the overall portfolio brands, but they did sell some other brand of products. But not the ones that you sold? Not the ones that my client sold. But you told me that your client was the exclusive distributor for all Smithfield products. It is for the products that it was selling. For the 40 products that it was selling, it was the only distributor. So it's only the ones that you say were previously farmland branded products? Yes, and that. All right. So there was at least one other distributor for Smithfield products that had not been previously branded as farmland? That's correct. Okay, I misunderstood. And my client takes no issue with that. And so you just want the 40? We just want the 40. And even though Jose Santiago contends that he was the exclusive distributor of the farmland food products that are now Smithfield products, it recognizes that at the time it finally completed this action, the status quo was that Ballester Hermanos was distributing some other Smithfield products, and so the injunction request is just reasonably to maintain the status quo of a non-exclusive distributor for the 40 products. And the 40 products for which Jose Santiago created a market in 2003, and you see it in Plaintiff's Exhibit 1 in the hearing. Jose Santiago started selling the products, and it was $2 million in annual sales. 2021, it was $11 million. So do you know why their offer was to reduce your 40 to 7? That's a good question. And there's nothing on the record showing that other than they had different distributors, and they decided to assign some to one distributor and not to others, despite the fact that my client was the only one who sold the 40 products in Puerto Rico for Smithfield. So there's no reason on the record. And the only justification, which is what Law 75 requires, because at the end of the day, reducing the number of products assigned to my client requires just costs under Law 75. And the only reason provided for not filling orders to Jose Santiago after June 2022 is that Jose Santiago refused to sign a written distribution agreement for the 7 products. Does JSI continue to distribute Smithfield products? Could you repeat that again? Does JSI continue to distribute Smithfield products? It does at this point in time. It continues to redistribute. Is it limited to the 7? Well, the issue is that as it is right now, mostly— I mean as of the time that you sought the preliminary injunction. I don't mean today. At the time our client sought the preliminary injunction, yes, they were selling the 40 products for Smithfield. Okay. Yes. Why did you need an injunction then? Because right now we're not. Right now the position of Smithfield is that my client is not a distributor, that my client has no rights under Law 75, and that any order that it's filled, it's at their discretion because this is according to what we believe is an error of the district court. This is on an order-by-order basis. And if you think about it, since 1995, there has been no written contract. So if that's the case, then my client has been for 27 years in our relationship on an order-by-order basis. It makes no sense. Were Smithfield and Farmland competing? Did they have any overlapping product lines? At this point in time? No, before the merger. Well, Farmland—Smithfield had products in Puerto Rico and mostly sold in the retail market, supermarkets. But in the food service distribution market, Smithfield was not one of the brands. And if you see Plaintiff's Activity 11 in the preliminary injunction hearing, it's the notice that it shows the brands that they had been selling in the food service market and the consolidation on two brands, Smithfield and Margarita. And that's how they decided to do it. So is the answer to my question no, that Smithfield had no—did not compete at all in the food service market with Farmland? Before deconsolidation, no. Before deconsolidation, no. So turning back to the purposes of Law 75. Before you get to the purposes, which are well spelled out in the brief and we understand the whole concept of your client having made this effort to develop this market, so we got that. The excuse that the court gave, the justification that the court gave, was that it was just cause because you were tardy in payments. Could you address that? Sure. And that's also a very good point. The reason why Smithfield decided not to fill orders for Jose Santiago after June 2022, it's not because there were tardy in payment for eight days on some of the invoices. That was not an issue for 27 years. It became an issue one month before the preliminary injunction hearing was set. The evidence on the record is that there's not one single invoice that my client did not pay, and the issue that occurred actually is not that my client was paying late. It was that it had a credit limit of $750,000 set by Smithfield, and since sales in 2020 were $6 million and had increased to $11 million in 2022, that credit limit seemed insufficient and appeared to be insufficient. Smithfield decided to withhold orders until the payments under the credit limit were made. My client made the payments, and as the district court correctly pointed, that was not an issue. That's a pretext. So prior to 22, were there any issues ever about tardy payments? Not at all. Was there a practice of allowing tardy payments that did not go protested? If there were any tardy payments, there were no issues raised at any point in time by Smithfield, and there's no evidence on record that before April 2022, that was ever an issue in the relationship between the parties. That's what the record would show. And so turning to that just cost, we honestly believe that that's just a pretext. That's a pretextual reason set one month before this case was filed, and it was not an issue. The other justification or just cost exposed by the district court says there was somehow an impasse in the negotiations between the parties, but that cannot be a reason to justify termination of an agreement covered by Law 75 when the agreement proposed to my client constituted an impairment under Law 75 because it was effectively reducing the number of drugs that it had been distributing, and it was set to be non-exclusive. So there was no sort of negotiation. This was a take-it-or-leave-it. We're not going to fill orders after June 2022 if you don't sign this agreement. So that cannot be considered an impasse in negotiations. My client had been the distributor for 27 years. Given the standard of review, are you arguing error of law or clearly erroneous fact-finding? We argue error of law. And what specifically was the error of law? We believe the district court committed several errors in interpreting Law 75. First, determining that my client did not have a dealer's agreement, even though my client was a dealer under the law as the district court determined. Second, determining there was just cost to terminate the agreement based on the party payments when that was not an essential obligation. And third, determining that there was just cost to terminate the agreement based on an impasse of negotiations, when that impasse was effectively an impairment of the contractual relationship between the parties, which is a violation of Law 75. Thank you, Mr. Fernandez. Excuse me. There was a written contract at some point? What's that? There was a written contract between you and Farmland at some point? Never. Never? There had never been. There was a letter in 1995, and you're going to see that plaintiff's exhibit one in the preliminary injunction hearing, a letter in 1995 appointing my client as a Farmland exclusive distributor in Puerto Rico. That's it. You don't consider that a contract? Well, in the terms of what the district court determined was required to exist in a contract, there was no written agreement in terms of fixed volume of purchases, fixed volume of sales, or fixed prices. Those were never elements of the contractual relationship between the parties. It was an appointment. My client and Farmland and afterwards would continue doing business as they always did, placing orders and my client taking charge as a distributor, doing the duties of a distributor under Law 75. And my last question is, is there any reason why you don't have an adequate remedy at law so that everything you say be correct? Well, the thing is that what my client is requesting right now is a remedy established by Law 75, which is the statutory injunction provided by the law, which is the protection that promotes the public policy of Law 75. So that's a remedy my client has. But it's a statutory remedy, which is precisely the injunction we're requesting and was denied by the district court. There are no more questions. Thank you for your time. Thank you. At this time, would counsel for the Appley please introduce himself on the record to begin? Yes, good morning and may it please the court. Ryan Fry on behalf of Appley Smithfield Package Meats Corporation. Looking back over the nearly 60 years since Law 75 was enacted, we have not found a single First Circuit decision reversing the district court's ruling on a Law 75 motion for preliminary injunction. The standard is abuse of discretion with significant difference afforded to judgment calls of the district court and factual findings reviewed for clear error. Where Law 75 preliminary injunctions have been granted, it's generally to avoid what would be a debilitating impact on the distributor. And the fact patterns pose genuinely dire circumstances. You typically see evidence that the supplier accounts for all or a substantial portion of the dealer's business in Puerto Rico. You see evidence that the dealer is going to have to lay off its employees in the absence of an injunction. And you see evidence that the distributor might go out of business. Judge Thompson, to your question, there is an adequate remedy at law here,  and that is the formula for lost sales damages under 278B of the statute. The purpose of the provision... The response to that is that your formulation essentially discriminates against more successful dealers and that Law 75 shouldn't be interpreted that way. Your Honor, my response to that is this is not discriminating against more successful dealers. This is simply holding them to the standard of demonstrating the impact. This is going to actually have on them. If Smithfield accounted for a substantial part of their business, then perhaps they would have an argument for entitlement to the provisional remedy if they could establish the other factors. But the evidence in the record shows nothing remotely like that, Your Honor. But there's nothing in the statute of the case law that says if you can handle and survive the unlawful termination, then you can't get an injunction. There's nothing in the case law that I've seen that says... It's just a factor that you would throw into a weighing analysis. That's right, Your Honor, and I would point the court to the Puerto Rico hospital supply... Excuse me. I'd point the court to the Freightliner LLC Puerto Rico truck sales case out of the District of Puerto Rico where just like Jose Santiago, the dealer was complaining about potential reputational harm and loss of sales, and the court said all of the alleged injuries would involve loss of income and reputation. Those may be compensated with a monetary award. That fact alone precludes granting injunctive relief. When you look at the factual evidence here, Jose Santiago at the evidence you're hearing actually emphasized its financial well-being. They talked about how they're the largest food distributor in Puerto Rico in the entire Caribbean. They talked about their strong financial health, no long-term debt, $40 to $50 million in cash in the reserves in the bank. But clearly the district court's analysis didn't hinge on that. The district court seemed to start off with a presumption, with a finding that they weren't a dealer. You're right, Your Honor. The dealer concluded that they... How do you sustain that finding? I mean, given month in, month out, they're the only one distributing to the food service industry in Puerto Rico the farmland products, and they continue to do that even after the acquisition. So how do you say they're not a dealer? They just happen to show up each month? Your Honor, we're not challenging on this appeal their status as dealer. What we're challenging is that the existence of a dealer contract, and even if you assume, as the district court did, the existence of a dealer contract, we're challenging the fact that there's been no demonstration of impairment to contractually acquired rights. Okay, so we're going to assume they're a dealer. Now, do they have certain contractual rights? The law is they don't need a written agreement to have those rights. We can infer from the pattern of conduct. It seems like they... How else would you... If you could not infer a contractual right to continue distribution after years of distribution, then when could you ever have a non-written contractual right? Your Honor, you're correct. The case law does indicate you can have an unwritten dealer contract, but I need to orient the court to the claims as pled in this case. The claim is that there is a non-exclusive, unwritten agreement for the distribution of Smithfield-branded products from February 2021 through the present. That is the alleged contract at issue here. In the case law, since the Welch decision has been very clear, including the Irvine case, that to understand if there's been an impairment, you have to look at what the actual specific terms of the relationship are. You're correct, Your Honor. You can look at course of dealing. And here, the evidence in the record is that there were great fluctuations in the course of dealing, no ability to predict the ordering. There was, on the face of the orders themselves, the written purchase orders, JSI put in the language telling Smithfield that, quote, if you do not agree with prices, terms, quantities, freight, and pack sizes in this purchase order, do not process the order until buyer sends you a new purchase order. But the course of dealing in and of itself builds in a flexibility between the parties. The course of deal, there had been flexibility, Your Honor, but I think look at what Mr. Santiago, Sr., himself said at the hearing. He said, we, JSI, were under no obligation to order any particular products from Smithfield, and yet they're trying to, through an injunction, without satisfying the standard, effectively write the availability of certain products into a contract when that never existed. It was never part of the dealings. But the rest of what they're saying is that when we had that need, that we were the exclusive dealers, and that everyone understood that to be terms of the contract. The exclusivity, Your Honor, is limited to the farmland chapter of the relationship. And they say that they're only looking to get back the 40. There is no evidence in the record, contrary to what Mr. Fernandez said, that the 40 products they're seeking an injunction for were all uniformly the same products that were existing under the farmland. But they still have the same, some kind of international product number. And through that branding, they can tell it's the same product. Yes, Your Honor. The evidence in the record from Mr. Michaels, as he explained, is that some of the G10 numbers were, in fact, the same. But the way the brand consolidation process was undertaken was Smithfield, as a whole, not specific to the Puerto Rico market, not specific to JSI, took their most popular performing SKUs and eliminated redundancies. So that eliminated many of the former farmland products and also the products that Biostair was distributing in Puerto Rico. Your Honor asked about the existence of – Why did you reduce from 40 to 6? Your Honor, as Mr. Michaels explained at the hearing, the reduction down to 7 was actually a very conscientious, reasonable decision, and Smithfield did, on account of JSI's recent ordering history. They actually looked at what JSI had, the most popular items they were purchasing, and they decided to give those to them. It was more than 60% of JSI's product purchases by weight. It was not arbitrary. The Law 75 is designed to prevent bad faith arbitrary conduct. As the district court found here, the brand consolidation plan was undertaken in good faith. There was no evidence it was done in bad faith. And while the offer for the 7 SKUs might not have been exactly what JSI wanted, it was a reasonable offer, and that's a factual finding. But is the 40% still in production? And if the 40% that you did not offer, is it still in production? And if so, why didn't you offer it to them? Your Honor, the evidence, the record is clear that after approximately a year or two of good faith negotiations, JSI was unwilling to enter into, the exclusivity was a sticking point. Ultimately, when it became clear JSI did not want to enter into a contract to become a non-exclusive distributor, Smithfield entered into an exclusive contract with the other existing distributor, Biastare. And to answer your question, Your Honor, many of those products from the 40 are part of that contract. So before your client entered into the exclusive dealer agreement with Biastare, is it true that all of the meat products at issue here that were sold in the food and service industry were supplied through JSI? No, Your Honor, that is incorrect. Okay, so what, who else supplied that industry with product? Your Honor, to answer your question, there were two existing food service distributors in Puerto Rico for Smithfield. One of them, Biastare Hermanos, distributed eight brands of packaged food service pork products prior to 2021. The other distributor was JSI. They distributed a quarter of the brands, two brands. And so these were, if you look at the actual reason was... And those eight brands were distributed to the food and service industry? Correct, Your Honor. That is what Mr. Michaels testified to at the evidentiary hearing. And what he explained was that when you undertake the good faith business decision to consolidate your brands nationwide and you take ten brands that have been distributed in Puerto Rico and you narrow it down to two, the only reasonable way to proceed fairly to both of your existing distributors is to offer them both an opportunity to have access on a non-exclusive basis to the new portfolio, which is what Smithfield did. And JSI was unwilling to agree to that, which is why from 2021 onward, they submitted purchase orders and Smithfield, if it chose to, filled them. But Your Honor... Counsel, can I just, just for a point of clarification, relying on the evidence in the record, these eight brands that had previously been distributed by Biastare, were any of those brands distributed also by JSI? No, Your Honor. None of them were. Was there an exclusive arrangement with Biastare as to those eight brands with respect to evidence in the record? With respect to evidence in the record, Your Honor, I don't think that question is answered. But I do know there is that those brands were not distributed by JSI. But if I may, I'd like to move to the two different... With those products, to one side how they were branded, was the same product distributed by JSI? Yes, Your Honor. There is evidence in the record that the whole impetus behind the brand consolidation was that there were the same products in redundancies in multiple product brands that needed to be eliminated. So I think you're arguing that even if they were a dealer and even if they had the contractual rights that they say they have, your client had just cause as a result of the consolidation to propose the impairment that it proposed. That is precisely correct for two independent reasons, Your Honor, both of which are factual findings reviewed for clear error. To answer Your Honor's question, it's not a legal determination. As this court held in the Hydrostop case in 2006, the finding of just cause as to untimely payment or otherwise is a factual finding reviewed for clear error. And there were two factual findings that the judge made here. The first is that there was a pattern of untimely payment. This is not a situation like last year's CASCO decision where there was actually evidence in the record that there was a retaliatory motive based on bitterness of the dealer selling to Volvo, the competitor. There was no evidence in the record here. Moreover, this is not, unlike the CASCO case which dealt with post-trial motions and jury findings, this deals with evidence submitted at a preliminary injunction hearing. Those are factual findings. It's a different standard of review. The evidence here in the form of Mr. Michael's sworn declaration, which is at J.A. 102-103, and Mr. Michael's testimony at the hearing, J.A. 455-457, is that there had been a history, not just from the past couple months, there had been a history over a couple years of late payments. But that does not cut against you. Doesn't that suggest that if there's a history of late payments and they didn't can them for that reason, then all of a sudden when they turn around and cite that reason, it starts to look a little like pretext. No, Your Honor. I don't believe it does cut against us for the very rationale that this Court articulated in the Hydrostat case. It makes us wonder whether it was truly an essential term of the contract. Well, Your Honor, Mr. Santiago Sr. himself acknowledged at the hearing that it was part of the relationship. Timely payment was part of the relationship. The only exception that this Court has recognized to timely payment being an essential term, Judge Thompson, was in the biomedical instruments case, which articulated this abnormal circumstance factor. And the abnormal circumstance in the biomedical case was when there was evidence in the record that the president of the supplier had actually told the dealer, don't worry about the timely payments. That's not going to cause a detriment to our relationship. And that is an abnormal circumstance. There are no circumstances along those lines present here. But did they tell them, look, you've been late before and we let it go for a couple of years. Now we're not going to let it go anymore, no more late before. No more late anymore. Judge Cayada, the evidence in the record is that there had been an existing problem and historically orders had been held. In terms of actual verbal statements, I don't think there's evidence in the record on that outside of the written emails from the spring of 2022. But as the District of Puerto Rico held in the Mariama case, just because there is not a written record, for example, in a letter of termination, articulating that the timely payment issue was the reason, it doesn't mean that as a matter of fact that was not actually the reason. There has to be affirmative evidence of pretext. And although counsel can argue they think it was pretext, that's not the standard. They have to induce evidence showing that there actually was pretext. And there is no evidence on the record of that. When it doesn't come up in such force until there's a breakdown in negotiations, why isn't that evidence? Your Honor, it is true that late in the pandemic there was a written email exchange with the accounts receivable department at Smithfield and that that did happen to coincide with the most recent set of negotiations. But there's no evidence that what the accounts receivable people were saying, and that is you haven't paid in a timely manner, we have to hold your orders, wasn't true. And also Mr. Michaels testified in part that over the course of the pandemic, this payment issue became more of a problem because of all the global supply chain issues and the economic impact. So he explained why this was a continuum that it had become a more severe problem, Your Honor. But to your second point, the breakdown in negotiations, that is a second independent factual basis to affirm. The judge found that I am out of time, but there was an independent factual finding. You finish your thought. Thank you, Your Honor. That after what Mr. Santiago Sr. testified to as a couple years of back and forth, the parties were unable to reach agreement on essential terms, namely the product listing and exclusivity. And for that reason, they chose to sue. And that is an independent basis for the alleged impairment. That's a factual finding. And as the court has recognized, that is an independent basis to affirm. Thank you, Mr. Frey. Thank you very much. Mr. Frey. Excuse me. Mr. Frey, one more. Yes, Your Honor. Just one last question. There was some thought in the briefing that given the purpose of Law 45, that we should think about the notion of irreparable harm slightly differently to carry out the purposes of what harm Law 75 was intended to correct. Do you have any thoughts on that? Law 75 was intended, in terms of irreparable harm, it's often spoken of with respect to just cause. It was intended to prevent arbitrary impairments or terminations that are done without just cause. And oftentimes, when there is a discussion of irreparable harm, it's in the context of just cause, which I've addressed. And I think, moreover, Your Honor, the purpose of the statute for a provisional remedy is when there's really going to be a devastating impact such that the formula for damages to be used at trial or after trial will be insufficient. And there's a genuine risk that this company is going to go under. Did I answer your question, Your Honor? Yes. Thank you. Any other questions? Thank you. Thank you very much. At this time, counsel for the appellant, please reintroduce yourself on the record to begin. You have a two-minute rebuttal. Good morning again. Alfredo Fernandez for appellant. I want to address the last question raised by Judge Thompson as to irreparable harm. In the Luis Rosario case, this First Circuit decided that a preliminary injunction under Law 75 does not require a showing of irreparable harm or likelihood of success on the merits. Instead, the decision is tied to the interests of all parties concerned and the public policy and purpose of Law 75. That is precisely what the statute says. The other issue I wanted to raise is the fact, and counsel argued, that because the law provides a compensation formula, somehow my client is not entitled to a preliminary injunction. That would then destroy the viability of a preliminary injunction under Law 75 in every case because the injunction provided by Law 75 is to maintain the status quo while the case is decided on the merits so that the distributor and the principal are in an even-handed position on both sides until the case is decided on the merits. On the status quo, your opposing counsel just informed us that BHI distributed eight products, according to McMichaels, to the food and service industry before the consolidation. If you look at Plaintiff's Exhibit 11, which is the notice provided by Smithfield to my client as a distributor and to all clients of the consolidation, you're going to see that there were several branded products sold by Smithfield in Puerto Rico, Armour, Eckridge, and John Morel and others. Out of those brands, some of them were distributed by Byster, and one of those brands was Farmland, which was distributed by my client. My client is asking for the preliminary injunction in this case to maintain the non-exclusive relationship with Smithfield. So at this point in time, my client is not expecting, and did not ask the court, to reestablish an exclusive relationship in the distribution of the products in Puerto Rico, but to maintain the status quo, which was that my client would sell the 40 products that were Farmland products, and Byster will sell whatever products are now Smithfield that they used to sell on their other brands. That's what my client is asking in this case. So to that effect, the last point I wanted to make, and I know my time is running up, is that under Law 75, a presumption of impairment is established when the principal appoints another distributor, which happened here when they appointed Byster in October 2021, and when a principal fails or decides not to fill orders without just cause, which is what happened in this case when they decided that they would not fill my client's orders unless my client signed the new written distribution agreement that they wanted to set with the seven products instead of the 40. So that's a presumption that Smithfield failed to rebut during the course of these hearings. And finally, Law 75 is not designed to protect weak distributors instead of stronger or more capitalized distributors like my client. The definition of dealer in Law 75 is a dealer who promotes a product. It does not make any difference whether it's successful or unsuccessful in the sale of the product or whether the impairment or termination is going to devastate the business or not. It's an even-handed solution in Law 75 for all distributors. So making the differentiation, as this report did, that because my client would lose $13 million in annual sales, that would not be a big hit in its business, it's irrelevant because that's not what Law 75 is. Counsel, is there any dispute between the parties over whether one of the reasons for the breakdown in negotiations over a written contract is JSI's insistence that it be an exclusive arrangement? Or is that agreed to by both sides? That's on the record. My client did testify on the record that when Smithfield started to, or it started to sell Smithfield-branded products in Puerto Rico, Smithfield did not require an execution of an agreement or condition the sale of the products on anything. They just continued to do business as usual. At one point in time, after more so over years, being the only one selling those products, Smithfield proposed a non-exclusive distribution agreement, and my client refused because it had been the exclusive distributor of the Smithfield product for the period of time. So you want the court to order a non-exclusive continuation, and then you'll argue to the jury you should get even more than that. That's correct. Thank you for your time. If you don't have any more questions, I appreciate it. That concludes argument in this case.